So, first case on the docket today is, may I mispronounce this, Stearns v. Stearns, 5-11-200, and it's Mr. Yother. You may proceed. May it please the Court, Your Honor. This matter arose as a petition for educational expenses under Section 513 of the Illinois Marriage and Dissolution of Marriage Act. Neither party denied their ability or obligation to contribute in this case, and accordingly, the primary issue determined by the trial court was how much the party should be required to contribute pursuant to Section 513. Among the factors for the Court's consideration, 513 requires the Court to consider the financial resources of the parties when determining the proper award, and case laws demonstrated that where educational expenses for a private institution are at issue, the availability of comparable and less expensive public institution is another relevant factor for the Court's consideration. In this matter, the lower court ordered each party to pay one-half of their daughter's educational expenses to attend the nursing program at St. Louis University, a private university. It is the appellate's contention that the trial court abuse its discretion in making such an award, where the evidence demonstrates the substantial disparity in financial resources exists between the parties, and further, where the evidence demonstrated the availability of a comparable and far less expensive public university, namely Southern Illinois University-Edwardsville. First, I'd like to discuss the disparity of incomes between the parties. The trial court used an average of the parties' adjusted gross income for the years 2007, 2008, and 2009 for its analysis of their financial resources. Accordingly, Mr. Stearns had an average adjusted gross income of approximately $140,000, and Mrs. Stearns, now known as Mrs. Katubig, had an average adjusted gross income of approximately $367,000. Now, with these figures in mind, let's consider 513 for a moment. 513a states that the court may award sums of money out of the property and income of either or both parties as equity may require. Does equity require both parties to pay one half of the $20,000 per semester tuition, where one party has an income of around two and a half times that of the other? The copy of Black's Law Dictionary sitting around in my office defined equity as striking the ordinary conscience and sense of justice as being fair, right, and equitable. And now define it as you will, but as discussed throughout my argument, a fundamental notion of fairness is the overarching concern in actions proper suited to 513 as demonstrated by the factors themselves and delineated – well, as delineated by the legislature and borne out through case law. Let me ask a question. Your opponent in his brief says that your client admitted that he was able to pay half of the costs during his testimony. Is that correct? That is correct. What was the context of that in the record? I mean, was he directly asked, are you able to pay one half? I mean, is it that clear? I believe it is that – I can't remember exactly what counsel asked, the exact question, whether he said, are you able to pay, contribute to your daughter's education? He's like, yes. Or if it was, are you able to contribute one half? I can't remember that exact phrase. I can find it fairly quickly if you'd like. Okay. Well, let's just assume for a moment that he was specifically asked, can you contribute one half, and he said yes. Okay. So is your argument then – your argument is not that he's unable to contribute one half. It's just that it would be unfair for him to because of the disparity in income. Is that where we're at on this? Essentially, except what you have to remember is now not just from the language of the statute itself but from case law, the idea was to come up with a fair and principled resolution to the matter. And with this much of a disparity, it's substantial, and the tuition is substantial. And while he may be able to pay one half, technically able, the financial burden on him is drastically disproportionate to the other party. And in that respect, it's inequitable. Okay. So you argue it's inequitable. Our standard of review is abuse of discretion, defined as no reasonable person would have adopted the view of the trial court. So when we have a situation with your client saying I can pay half, how can we say it's an abuse of discretion for the court to order him to pay half? I guess to that I would say that when looking at these circumstances – I mean, yeah, is he technically able to financially come up with a way to pay for this? Yes. But under these circumstances, the huge disparity in incomes – and as we go on, I can get into other things if we get there. But the court, by looking at this and arbitrarily requiring each party to pay over one half, like I said, left him with a disproportionate financial burden. I mean, in light of the disparity, in light of sort of this general notion of just like fairness and equity that the statute and case law has established, that when you look at a disparity this big and you look at the size of the tuition, that just because a party is able to pay that doesn't mean that it's necessarily equitable to have them pay one half of the tuition when it would – when the burden is so much greater on one party than the other. If the wife gets $3 million and he got $1 million, is that okay? I see what you're saying, that like where's the line with that. And like I said, he's around $140,000, average over three years. It's not always that. In 2009, it was lower. She's at $367,000. We're not talking about $3 million, $1 million. But I see – I get your point. I'm not asking the court to, by any means, shed tears for Mr. Stearns because he doesn't – he's going to be now put in a poor house or something because of this. But when it comes down to it, he – from his point of view, this matter arose essentially pursuant to their Marable-Solomon Agreement because of its provision. If the parties do not agree, you may petition the court for a level to be set. Mrs. Stearns petitioned the court under 513. We have these factors. We have this equitable charge. We have this case law that looks at – has expounded on the idea of financial resources to include other things and this, that, and the other. And it all boils down to coming up with the most fair and principled, conscientious judgment you can. Is that what we're supposed to do? Am I asking you to – Is that what we're supposed to do, come up with a fair, equitable decision? And if we did that, would we be true to our standard of review, which is to only overturn the trial court if the trial court's decision is an abuse of discretion? In other words, we can't substitute our judgment for the judgment of the trial court. And maybe if I was the trial court, maybe I would have agreed with you. But that's not the standard. I understand that. I understand. And well, let me – actually, let me bring up another point. For example, the trial court specifically denied their requirement to consider other things with regard to – that exacerbated the disparity. For instance, the fact that he now has a child support obligation to his second family. And case law has shown that that's a relevant factor to consider under – whether it's under financial resources or whether you're talking about the statute's broad language of the court shall consider every fact. So there are also other things involved in this idea that I'm putting out there about, like, that inequitable equals abuse of discretion. There's more to it than just simply what we were discussing before. Additionally, he's lost – with his new course, he's lost at least an additional $25,000 a year. So I guess this kind of comes back to the point you raised, Your Honor, where it's the line. You know, like, okay, let's say the trial court took into consideration the $25,000 grant, took into consideration child support. Okay, now let's say we're around $100,000 versus $370,000. That just exacerbates the disparity even further. And I guess, like, the standard for abuse of discretion, in that regard, when you look at the disparity, the trial court's judgment ordering one-half of each despite that… …despite his – of their combined resources, his is about 28 percent, I believe. And… His share of the overall income. Like, yeah, whether you like that formulation or not, if you put all their money in a big lump, his is about 28 percent. I believe that's correct. I could look through my brief. And in that regard, the trial court's judgment was arbitrary, we are contending, in that it – in that he ultimately was prejudiced by now being – having this much more substantial financial burden placed on him. I mean, if the general idea of 513 in case law is that we're supposed to come up with a principled judgment, what about these circumstances require – just require both sides to just arbitrarily play half despite the burden on one party being drastically greater than the other party? I mean – or technically, either side is probably able to pay it all, but whether you're talking about half or whether you're talking about the whole thing, the burden on Mr. Stearns is far greater. Have I answered your question for the most part at this point? In that case, I think I'm just going to go ahead and move on to the idea of public versus private universities. Well, and this – and also, like, keep in mind, this – the idea of a public versus private factor, this is in conjunction with the financial resources factor. It's all part of the factors before the trial court. And I think it demonstrates further the inequity of the decision. Okay, a little bit of facts. Both SLU and SIUE – St. Louis University and SIUE – offer a bachelor's of science in nursing. They both offer the same degree. During the time period at issue, SLU's tuition cost was about $20,000 per semester, while SIUE's average was approximately $9,000. And case law has shown that to justify a court award of educational expenses for a private university, you have to show that there are special programs or attributes for the private university to make the cost reasonable under the circumstances, or the more expensive school was necessary or more appropriate for the trial. In granting Mrs. Katubek's petition for educational expenses based on SLU's tuition, the lower court found that St. Louis University has considerable attributes that benefit Jessica in ways that a public university, specifically Southern Illinois University, does not. There was evidence introduced, wasn't there, that SLU's nursing program is one of the top ten in the country. They have a 100% placement rate of their graduates. Wasn't that part of it? Yes, I agree. But as far as rankings, I think – now, we'll take that placement rate and put that aside for just a second. But as far as rankings, national rankings and this and that, when would we ever have a public-private debate if that was the kind of attribute that we're talking about with regard to whether the school is necessary or they have special programs and that kind of thing? I don't believe that rankings and those sorts of things could possibly form the basis of that kind of decision when you're basically trying to decide was – did the private-public university – was it adequate and comparable to satisfy the child's educational goals? Wouldn't that fill the question? You'll have time to rebuttal, thank you. Your time's up. You'll have to rebuttal. Time flies when you're having fun. Thank you, sir. Mr. Lady? Thank you, Mr. Gordon. Counsel? Since there's no evidence in the record that suggests that Judge Salvers, in this case, abused her discretion in entering the order that she did, as a question you asked, Judge, earlier about the question whether it was posed to Mr. Stearns during the trial about whether he had the ability to pay for – was directly to SLUB the answer was yes. At all points in time, my client was contending that he should be forced to pay half the cost or that they divide equally the cost for their daughter, Jessica, to attend SLUB. Okay, so just to make sure I understand, the record would reflect that he was asked directly, can you pay one half? Are you able to pay one half? Correct. He was asked specifically, you're not contending that you can't pay. Your issue is whether you should be forced to pay for her to attend SLUB. His answer was yes. Okay, but my question about that is, was it one half? I mean, was he asked, are you able to contribute? To contribute. In the context of the record, I don't know if the word half was actually used, but at all points in time, in the petition, throughout discovery and at trial, the position that my client took was that, which was well known to him and I think which was understood in that context was that he was being asked to be allocated half of the responsibility for the daughter to attend SLUB. So even though the record may not use the word half, I think that all parties who were there understood it in that context. When you say, and I don't remember exactly how you had it in the brief, but he admitted he can contribute. He didn't admit he could contribute one half of the cost. Is that a fair statement? In that context, the word half is probably not used. That is correct. I mean, of course, parties agree to contributes as they are able to the children's post-education. If they are unable to agree, either party may pitch to the court for a level to be set. That's correct. On the MS. Correct. That's what the agreement said. That's what the agreement said, which is what Judge Wolferson hit in on right away, was what the parties had agreed to. And some of the cases that we cite in our brief deal more with the marital settlement agreement issues than directly an analysis of the factors under 513. But Judge Wolferson deemed that to be important, and it is important because that marital settlement agreement does express the intentions of the parties. They'll contribute to ask their financial aid. His testimony was, I'm able to contribute. There was no question about that. And I don't see that as an issue at all. The whole issue is how much should he be ordered to pay. Well, and that's why I think that Judge Wolferson, hearing the evidence and testimony, obviously was in a good position to review those facts and make good decisions based on those facts. In fact, I was reviewing her order in preparation for appearing here today and arguing, and I wish my brief actually did her order justice. I think it's a far better order than my brief was, because she does. She goes through the statutory factors. She goes through the marital settlement agreement. She goes through the public-private distinction. It's a very, very well-written order. It's detailed. It's extremely— It gives us a lot. We know what she was saying. It's extremely detailed, Your Honor. And if anything, I think that reviewing her order shows that it's anything but arbitrary in the decisions that she made. I mean, certainly there is a big disparity in income. There is, but the other thing that is—that income that's reflected also keeps in mind that that was income off of— my client's joint tax returns were also filed with her husband as well. So I didn't really see the need to make an issue of that, because both parties admitted in trial that they had the financial ability to pay. You know, Mr. Stearns, in his last year that we had W-2, a wages form earned over $140,000. In the year that his daughter was going to college, he got a bonus of $21,000. He cashed in sixth leave for $22,000 and admitted to spending over $100,000 to further his racing pursuits in the years leading up to the daughter attending college. So it's difficult for him to come in and say this disparately impacts me. And, in fact, if the court would adopt the argument that my opponent is suggesting, that's the type of logic and reasoning that the Stockton case that they cite in their brief specifically prohibits. The court is not allowed to take and apportion educational expenses based on a ratio of the party's income, which is essentially what's being asked of the court to do in this case. As the court said, I don't think there's any issue that the parties have the financial ability to pay. Judge Hollerson also, moving on to the next factor, had noted that the child would have enjoyed, obviously, a high standard of living if the marriage wouldn't have stayed together and remained intact. And it was – there's evidence in the testimony of the record that it was the parties hadn't placed any limitations on where the children would attend college. They believed in education. And this was expressed in the marital settlement agreement, this intention of the parties towards their children's higher education that they agree to contribute as they're financially able to do. And moving through these pretty quick too, again, the financial resources of the child, Jessica did a lot of things to go out of her way to contribute as well. And the evidence in the record was that she had scholarships, she took out loans, she worked three part-time jobs, and she had contributed in the first two years of her school about $22,000 towards the cost, which the court did take into account, I think, overall in making their decision because they did not – they offset that amount against what they were going to order the parties to pay. So, in essence, they attributed 20 percent of those costs, of the overall cost, to Jessica. So, they really only split 80 percent between the parties, and it wasn't even a true 50-50 distribution, which, again, I think goes to the fact that Judge Salderson took all these factors into account and made good findings of fact based on the evidence that actually did appear in the record. And again, the fourth statutory factor, which was added several years ago, was that Jessica had good grades in school. She was National Honor Society and had a three-point GPA during her first two years at St. Louis University. In addition, when she was in high school, she had worked as a CNA, which, as we all know, is not probably the most glamorous of jobs because she wanted to go to nursing school, which I think is one of the important distinctions in this case. She put the time and the effort into high school because she knew she wanted to go to nursing school. Moving into the public-private distinction, the true advantage to SLU here over SIU-Edwardsville is that SLU has this direct entry program. I didn't even know that this existed until learning about cases. It's amazing what you learn, but at SLU, you were admitted directly into their nursing program as soon as you apply. You know you are in the nursing program. SIUE does not have a similar program. You apply as an incoming freshman for general admittance, and then once you've gone through two years of school, you have to apply separately again to try and get into the nursing program, which only takes about 70 students a year. There's no evidence that she would have even been accepted to SIU-Edwardsville, and she hadn't been accepted to their nursing program. She was only generally admitted to the university, which is, I think, a big factor that Judge Salverson deemed to be important in this public-private distinction, amongst other factors, because she had the certainty of knowing that her future was that she was going to be able to attend this program. There's no guesswork. There's no, I may go to school for two years and not get into the nursing program. None of that was present in this case. She knows she's in. As the court also pointed out earlier, there was evidence and testimony in the record regarding the rankings of SLU and their nursing program on a nationwide basis, which that's not an arbitrary factor either, and that's not something that can be discounted, because the cases that my opponent even cites in his brief specifically mention that that's one of the factors that the court can look at in this public-private distinction, is they want to know what is the reputation of the school, what is their rankings. SLU is among the top in the nation. There's evidence in the record to support that. There's no evidence in the record to support that SIUE maintains that same type of national prominence. Again, SLU, because of what they've done and where they're at in St. Louis, are matched up with arguably two of the best hospitals in the nation, certainly two of the best hospitals in St. Louis, which is St. Louis University Hospital and the BJC network. There's multiple BJC hospitals. And they take care of their own. I mean, they give priority treatment to the nursing students who are graduating from SLU at both of these facilities, to the extent where there's priority hiring, there's substantial sign-on bonuses, and on top of that, SLU in and of itself, their nursing program, offers 100% job placement for their graduates when they leave the nursing program. And, you know, jobs are always an issue. They were less of an issue, I guess, when we argued this in July of last year. They're even more of an issue now, and they're going to be even more of an issue when Jessica graduates from college. Because if you go the four years, get your degree, it doesn't matter where you go. And what you pay if you don't have a job when you get out. Nurses probably have a better chance of getting a job than lawyers do these days, don't you think? I don't think that there's anybody who would argue that the nurses probably perform in a lot of ways a more valuable service to society than lawyers do. We're not going to get any sympathy, I don't think, when it comes to that, Judge. But there, on top of that, Your Honor, there was Jessica testifying that one of the things that attracted her to SLU over SIUE was the fact that she was looking to go into pediatrics or maternity nursing. And SLU specifically offered clinical rotations in pediatrics and maternity, which was something that SIUE did not offer. I mean, again, Judge Salverson, I think, did an excellent job of walking through, again, all the factors and explaining in detail why St. Louis University was a more appropriate school for Jessica to attend under the circumstances. The only thing that we have in the form of, I would say, rebuttal, which is the respondent's burden then to come forth once the burden's met to show that they're not comfortable, is that there was a brochure, there was a stipulated exhibit that was entered into evidence that was just the general brochure of SLU's program. There's no evidence or testimony expounding upon that other than a brochure with the costs and with the program details that was introduced into the record. Simply put, there's no evidence to support that the trial court's findings of fact on these issues, which is weird. If you look through the case law, there's this manifest way to the evidence, there's this abuse of discretion. You know, it's manifest way to the evidence on findings of fact and abuse of discretion on the overall award, but I don't think there's any evidence in the record, Your Honor, that would suggest that the trial court's finding of fact in this case are against the manifest way to the evidence. There's really not a lot of dispute about what the facts are as far as the income. I mean, there are some variations about what should be counted and so forth. It's not that often where you get to try a case like this where the dispute really is over truly the rule. It's not, this isn't evidentiary issues. There wasn't, you didn't allow me to present evidence of an expert to testify regarding the difference between these two schools. There's none of that. This is a clean record as far as that goes. And the facts are not in dispute. Two of the cases, actually, that the respondent cites in their brief actually support, I believe, the position of my client in this case, specifically the Griman v. Friedman case and the Henry Marriage of Sienkiewicz case. Both of those cases, the court ordered the party to pay private school tuition costs, which are cases that my opponent cites in his brief. In one, the first one, they ordered the husband to pay the full cost of the private tuition of the daughter at Washington University, which I've applied to both SLU and WashU. I can attest to that. WashU is more expensive than SLU in that case. And then in this Henry Marriage of Sienkiewicz case, the court ordered the father to pay for the cost of the two daughters of the party to attend a private school called Columbia College, which is a private liberal arts school in Chicago. So their own authority that they cite in this court actually supports the arguments that we're making in here. And, again, in the Sussman v. Keller case, there is the court in that case overturned the lower court's decision because there was no evidence of the rankings of the schools or the placement rates upon graduation, which is all stuff that we have in the record in this case. As additional evidence, I think, that the court didn't abuse its discretion, Your Honor, this is a compromised verdict. The court, under the statute, could have awarded many other areas of costs, which they did not order the parties to split. There's no provision for health insurance, medical expenses, or dental expenses. There's no provision for transportation costs, no provision for food, no provision for miscellaneous living expenses. And there was evidence in the record that your client had provided a car, was making a car payment. That's absolutely correct. So we presume that's going to go on. As of, and I'll just limit the arguments to as of the time of the hearing, too, but my client had paid, other than the portion paid by Jessica, my client had paid for all of those costs for the daughter, not for Jessica, to attend SLU. And, again, I think, Your Honor, the fact that they took into account Jessica's contributions and offset that against what the judge ordered the parties to pay shows that Judge Saunders did a good job here. I mean, she took all of these factors into account and made good decisions that were based on the facts in this case. Because of that, there's no evidence that would support finding that her ruling was against the manifest way of evidence. Thank you. Thank you, Mr. Leighton. Any rebuttal? Yes, I agree, and the facts are not in dispute in this case. The issue is how the facts were viewed in light of the statute and relevant case law. And I want to come back to what we were talking about when I ran over my time, the placement, I believe it was, the placement rates and those sorts of attributes that were introduced into evidence. The issue there is that it is the appellee's, well, the petitioner's, burden to provide a meaningful comparison of the two schools' respective attributes. And, yes, they have great placement rates. I mean, it's a very prestigious school, and we're familiar with the facts. But what was not shown was that you would be any less marketable going to SIUE, that you would have a smaller placement rate, that you would receive less salary. That wasn't shown. What's important is what was not shown. Anything less than 100 percent placement would be less marketable. Yeah, I don't think that that's a very good point. I don't know where Edward Smith's placement is, but I don't know how you can beat 100 percent. Right, but the thing is, the appellate put forward that there was a comparable university, offered the same degree, has been around for half a century, offering this degree, has contacts with 800 health care facility, contracts for clinical work, has its own nurse ran clinical services clinic in East St. Louis. I mean, if what we're saying is that every time a private, expensive private university has a better ranking or status, that pretty much kind of does away with all case law that a public university could ever be considered comparable or adequate to satisfy their goals. And it's all in the brief. I'm going to let it stand for the rest of the part. I just want to address that very briefly. And also, just really quick, I want to touch on, we brought up, counsel brought up the standard of living the child would enjoy, that factor, that the court considered that. I would like to point out that that particular factor doesn't have an incredible amount of weight in these particular circumstances. It wasn't a riches to rags scenario. As far as if you're talking about just financially, the standard of living was great regardless of that. And also, he mentioned that she spent $20,000 of her own dollars from her part-time jobs. And there's nothing in the record that says what that money was spent on. She earned that much money. Whether that was just like, whether, I mean, I guess to the extent that your everyday driving around, going out, money is part of your expenses, yes, I guess that's the point. But no, that was not put back into, there's no evidence that that was put back into the education. You know, I don't want to, and I think we can all agree, we don't really want to nitpick these like years and exactly how much was earned in this year versus that. The 140 figure, the 367 figure, that pretty much works to get the general idea. But I feel as though in the brief, at testimony, in the court's judgment, there was this inclination to pick up on things like Mr. Stearns bought a motorcycle in 2008 with the money he earned from his bonus from work. 2008 was like a big year for him. His financials that year were different. He cashed out all his vacation, everything else, and before she was enrolled in college, bought a motorcycle with his own earned money. I just want to be very careful not to let him become painted in this horrible light that, oh, he spent money on racing, he spent money on a motorcycle for himself before she ever went to college. That is irrelevant. Thank you. Thank you very much. All right, gentlemen, we'll take this matter under advisement.